**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-13-08093-001-PCT-NVW |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Calvert Les Woody, | |
| Defendant. | |

Before the court are the Government's Motion in Limine Regarding Irrelevant, Unrelated and Remote Investigations from 2003 and 2004 (Doc. 83), the Response (Doc. 94) and the Reply (Doc. 96). The Government has moved to bar impeachment of one of its chief witnesses, FBI Special Agent Brian Fuller, regarding alleged embellishments and inconsistencies in testimony he gave in two prior criminal cases over a decade ago. Because the basis for Defendant's proposed impeachment is remote in time and minimally probative in any event, the Government's Motion will be granted, with one exception.

**I.     BACKGROUND**

Defendant, who is charged with two counts of abusive sexual contact and two counts of aggravated sexual abuse of a child, was interviewed by Special Agent Fuller at the FBI's Gallup, New Mexico field office in December 2012. During that interview, which was not recorded, Defendant allegedly made a number of incriminating statements

to Special Agent Fuller. Although FBI Special Agent Cheryn Priestino was present when Special Agent Fuller assessed Defendant's suitability to take a polygraph exam and informed him of his *Miranda* rights, she left the interrogation room before Special Agent Fuller began questioning Defendant about the allegations against him. Special Agent Fuller's notes and oral testimony are therefore the Government's only evidence of the statements Defendant allegedly made during his interview. Special Agent Priestino was also a witness to Special Agent Fuller's post-polygraph summary of statements Defendant had made, which he confirmed.

During discovery, the Government disclosed to Defendant information about two previous cases in which the defendants had questioned the reliability of Special Agent Fuller's notes or the truthfulness of his testimony. The Government does not view this information as exculpatory. Nevertheless, because the court has previously allowed impeachment of Special Agent Fuller on these collateral matters, the Government made its disclosure in an abundance of caution. (*See* Doc. 83 at 8.)

In the first case, *United States v. Miguel*, 2:04-cr-01289-EHC-1 (D. Ariz.), defendant Eric Miguel was charged with first-degree murder of his five-month-old daughter. Special Agent Fuller interviewed Miguel twice, on December 6, 2004, and December 7, 2004, and made hand-written notes of each interview, from which he drafted two separate reports. The second interview, unlike the first, was video-recorded, as it was conducted at a tribal police office. Unlike the FBI, the tribal police did not prohibit recording the interrogation. Ten days after the victim died, Special Agent Fuller testified before a grand jury investigating Miguel's role in the death. Following indictment, Miguel's attorney filed a Motion to Dismiss Indictment Due to Misconduct Occurring Before the Grand Jury, which alleged that Special Agent Fuller's testimony differed in material ways from the video and transcript of the hour-long December 7 interview. That video, which the court has reviewed in camera, shows Special Agent Fuller and two Gila River Police Department detectives repeatedly asking Miguel leading

questions and attempting to elicit his agreement to their descriptions of his conduct on the day the victim died.

Several elements of Special Agent Fuller's grand jury testimony to which Miguel objected turned out to be entirely accurate, and others were too trivial to detail here. Among the more substantive issues raised, Miguel took issue with Special Agent Fuller's characterization of how Miguel treated his daughter on the day of her death. For instance, Special Agent Fuller twice stated that Miguel had been "violently shaking" the victim in the hours before she died. (*See* Doc. 83-2 at 22, 25.) Miguel never used this word, and in two cases denied having shaken his daughter. (Doc. 83-10 at 10, 52.) In a demonstration captured on the videotape of the December 7 interview, Miguel moves a stuffed animal up and down in his hands the way a parent trying to calm a crying child would. Similarly, Special Agent Fuller testified that while walking down the hall with the victim in his arms, Miguel had tripped on a sharp object, which Miguel said caused him to "squeeze[] her even tighter." (Doc. 83-2 at 22.) The transcript reveals that Miguel actually said he "*held* on to her tighter." (Doc. 83-10 at 5 (emphasis added).) In his report of the December 6 interview, Special Agent Fuller wrote that Miguel "squeezed [the victim] tighter with his arm" after tripping on the sharp object. (Doc. 83-8 at 4.)

Miguel also contested Special Agent Fuller's statements that Miguel said he had "grabbed [his daughter] hard," (Doc. 83-2 at 22), and that Miguel realized his daughter had died several hours before she was taken to the emergency room, (*id.* at 23). The transcript of the December 7 interview shows Miguel making inconsistent statements on these points. At different times Miguel told his interviewers that he "grabbed" his daughter, (Doc. 83-10 at 3), that he "picked … up" his daughter, (*id.* at 4), that he knew his daughter was dead hours before she was taken to the hospital, (*id.* at 42-44, 46), and that he only became aware of her death after being informed that she was at the hospital, (*see id.* at 39-40, 45).

1            Finally, Miguel objected to Special Agent Fuller's answer to a question posed by
2    the grand jury about whether, as part of his investigation, he had tried "to determine
3    whether there was any medical conditions on [the victim] or something that would have
4    resulted in her death that is not related to the violent shaking she underwent." (Doc. 83-2
5    at 26.) Special Agent Fuller answered that he had posed that question to several of the
6    victim's family members, all of whom told him they were unaware of any ailments that
7    might have caused her death. (*Id.*) According to Miguel, the victim's mother in fact told
8    Special Agent Fuller during a December 8, 2004 interview that the victim's fontanel
9    "would fall in" and that the victim had been sick with diarrhea during the weeks before
10   she died. (Doc. 83-4 at 6.) In addition, Miguel claimed he had himself told Special
11   Agent Fuller on December 6, 2004, that the victim had "had health problems" in the
12   months preceding her death, which caused "tightening up" and difficulty sleeping. (*Id.*)
13           The second case, *United States v. Dosela*, 2:03-cr-01234-NVW (D. Ariz.), also
14   featured charges against a parent for murdering a young child. In that case, Special
15   Agent Fuller testified at trial to statements that defendant Sharon Jane Dosela had made
16   during an interview shortly after Dosela's daughter died from blunt force trauma to the
17   head. Special Agent Fuller testified that two to three weeks before the victim died, while
18   walking home from a visit to a different part of the reservation where she lived, Dosela
19   had tripped and fallen on top of the victim several times. (Doc. 83-7 at 159.) On cross-
20   examination, Special Agent Fuller acknowledged that the notes from his interview of
21   Dosela indicated that she "fell w/" the victim twice. (Doc. 83-7 at 78.) Notwithstanding
22   the "w/" notation, Special Agent Fuller maintained he had a clear memory that Dosela
23   said she had fallen *on* her daughter, not merely *with*—i.e., at the same time as—her. (*Id.*
24   at 78-79.) Special Agent Fuller further testified on direct that, according to Dosela, the
25   victim's stepfather would sometimes "yank" around another of Dosela's children, but
26   would stop when Dosela confronted him about it. (Doc. 83-7 at 188-89.) Dosela's
27   attorney asked Fuller to admit on cross-examination that his notes of this portion of his
28   interview read as follows: "[Dosela] confronted [the stepfather] then *she* would stop."

(Doc. 83-7 at 108-09 (emphasis added).)  If the notes so stated, they might have undercut the Government's argument that, despite being able to prevent the stepfather from beating the victim, Dosela declined to intervene to save her daughter.  The notes were not received in evidence, and Special Agent Fuller denied he had written "she" instead of "he."  (*See id.* at 108-09, 126.)

Dosela's final substantive contention concerned Special Agent Fuller's testimony regarding her state of mind.  Special Agent Fuller told the jury that, by the night before the victim's death, Dosela "believed" the victim "was … dying" from beatings inflicted by Dosela and the victim's stepfather.  (*See* Doc. 83-7 at 177-78.)  He admitted on cross-examination, however, that Dosela had never actually told him she knew the victim was dying; rather, Special Agent Fuller merely inferred from a number of Dosela's other statements that she was aware her daughter was near death.  (*Id.* at 96-98.)

## II.  LEGAL ANALYSIS

Defendant does not argue that Special Agent Fuller lied—that is, made knowingly false statements—in his *Miguel* and *Dosela* testimony.  Defendant does not challenge Special Agent Fuller as a knowingly untruthful witness.  Having examined the voluminous evidence in detail, the court concludes that Special Agent Fuller's prior testimony does not trigger a Government obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose it as possible exculpatory or impeachment evidence.

Rather, Defendant seeks to cross-examine Special Agent Fuller concerning his *Miguel* and *Dosela* testimony to show only that Special Agent Fuller is biased, that he subconsciously filters ambiguous evidence in a manner favorable to the Government.  Cross-examination may properly address both "the subject matter of the direct examination and matters affecting [a] witness's credibility."  *See* Fed. R. Evid. 611(b).  The trial court has broad discretion in permitting cross-examination.  *See United States v. Candoli*, 870 F.2d 496, 503 (9th Cir. 1989) ("The scope of cross-examination is within the discretion of the trial court.").  Here, the Government argues that, notwithstanding

that discretion, Defendant should not be allowed to impeach Special Agent Fuller's credibility by introducing the purported irregularities from *Miguel* and *Dosela*. This argument is grounded in Rules 404(b) and 608 of the Federal Rules of Evidence. The former provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The latter bars "extrinsic evidence" that is used "to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Neither Rule 404(b) nor Rule 608 prohibits admission of evidence, including extrinsic evidence, of Special Agent Fuller's prior testimony to show bias. *See United States v. Bailey*, 696 F.3d 794, 806 (9th Cir. 2012) ("Rule 404(b) has thus long been characterized as 'a rule of inclusion—not exclusion.' Indeed '[u]nless the evidence of other acts *only* tends to prove propensity, it is admissible.'" (alteration and emphasis in original) (citations omitted)); *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir. 1984) ("Rule 608(b) does not bar introduction of evidence to show that the witness is biased. It regulates only the admissibility of evidence offered to prove the truthful or untruthful character of a witness." (citations omitted)).

Nevertheless, to warrant admission, evidence must survive the balancing test of Rule 403, under which the court should "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

In this case, with one exception, the probative value of the ostensible discrepancies in Special Agent Fuller's prior testimony is minimal. They are consistent with the limitations of memory that often appear in testimony of recalled events. To allow them into this trial would perpetuate all effective cross-examination into any future trial in which the same witness testifies. That falls short under the test of Rule 403.

Several of the complaints raised in *Miguel* amounted to little more than quibbling over which of several acceptable words—e.g., "squeezed" and "grabbed"—to use in describing the defendant's treatment of his daughter.  Special Agent Fuller's statement that Miguel was aware of his daughter's death hours before she was rushed to the hospital did rely on certain portions of Miguel's contradictory December 7 interview to the disregard of others.  If Special Agent Fuller had more accurately characterized Miguel's statements as contradictory, they still would have supported a finding of probable cause. While regrettably one-sided, such testimony is permissible before a grand jury.  *See United States v. Williams*, 504 U.S. 36, 51-52 (1992) (holding that the government has no duty to present exculpatory evidence to a grand jury).  And even if it were not, Special Agent Fuller's testimony attempted to summarize conflicting statements made by an emotionally distraught and apparently confused suspect over the course of a lengthy interrogation.  As for Special Agent Fuller's response about potentially fatal medical conditions, he told the grand jury, truthfully, that other family members had specifically informed him they knew of no other conditions that might have caused the victim's death.  (Doc. 83-2 at 26.)  While a more complete answer might have mentioned the victim's fontanel or "bad case of diarrhea," (Doc. 83-4 at 6), there is no reason Special Agent Fuller would have considered such conditions fatal.  These matters are attenuated indications of a pro-Government bias, at best.

Special Agent Fuller's testimony in *Dosela* is of little value to Defendant's case. It is unsurprising that Special Agent Fuller's handwritten notes, generated in real time as Dosela was speaking, might contain several minor transcription errors, such as "fell w/" instead of "fell on" or "then she would stop" instead of "then he would stop." Special Agent Fuller explained on re-direct that when he wrote written reports of his two interviews with Dosela, those interviews were fresh in his mind and, as a result, he was able to include information that he did not manage to write down during the interviews themselves.  (*See* Doc. 83-7 at 125-26.)  He reviewed those reports, which were the basis of his in-court testimony, for accuracy before submitting them.  (*Id.* at 128.)  Most of the

purported inconsistencies raised in *Dosela*—including the two mentioned above, as well as others too insignificant to recount here—are of the kind that likely arise routinely in the process of converting contemporaneous notes into a polished written report, which in turn serves as the template for live, in-court testimony. To infer bias from such inconsistencies is to demand a photographic level of precision that is quite rare in human memory.

Of more concern is Special Agent Fuller's testimony regarding Dosela's knowledge of her daughter's impending death. At best he inferred from Dosela's statements about her daughter's moaning, crying and rolling around in bed that she knew the child was dying. Special Agent Fuller did not testify on direct that he was inferring, rather than relaying Dosela's own words; it took cross-examination to bring that out. But then, it is the point of cross-examination to flesh out testimony.

The portions of Special Agent Fuller's prior testimony in *Miguel* and *Dosela* discussed above have little or no probative value in assessing Special Agent Fuller's alleged bias. Arrayed against this modicum of probative value are the other factors enumerated in Rule 403. Chief among them is the danger of confusing the issues or misleading the jury. The cases with which Defendant seeks to impeach Special Agent Fuller were resolved almost ten years ago; some of the underlying interviews took place as long ago as 2003. It is likely that Special Agent Fuller's memory of those events has substantially deteriorated in the time since. As a result, any testimony he gave about *Miguel* or *Dosela* could become impossibly muddled and confused by his inability to recall the fine details on which any successful impeachment would hinge. Given the factual similarities between the instant case and the prior ones—e.g., Special Agent Fuller's investigation of a Native American charged with harming small children—the jury might well wonder whether *Miguel* and *Dosela* had any significance to Defendant's case beyond the effort to impeach. The two side narratives constructed on cross-examination would become a distraction from the facts of Defendant's case. Accordingly, the probative value of most of this impeachment on collateral matters

1  would be insubstantial and outweighed by the time that introducing such evidence would
2  waste and the confusion it could sow among the jury.  Defendant will not be permitted to
3  impeach Special Agent Fuller on these matters.

4        The scales tip the other way for one aspect of Special Agent Fuller's testimony in
5  *Miguel*.  Special Agent Fuller's description of Miguel as "violently shaking" his daughter
6  is unsupported by Miguel's words or his demonstration in the December 7 interview.  It
7  is a serious failure of perception and memory that a police officer would remember a
8  suspect saying or demonstrating what would be a serious crime when the recording
9  conclusively proves he said and showed exactly the opposite.  We all sometimes see or
10 remember what we expect or want to see.  But such a failure by a law enforcement officer
11 in such a serious matter has enough weight to balance the cost of presenting it to the jury.
12 It could shed light on what the officer sees and remembers and what he does not.  It could
13 shed particular light on the reliability of Special Agent Fuller's perception and memory in
14 this case, in which, pursuant to FBI policy, he did not record an interview in which he
15 says Defendant voluntarily confessed, despite an earlier recorded interview in which
16 Defendant maintained his innocence.  In the court's discretion under Rule 403, cross-
17 examination for impeachment will be allowed solely regarding Special Agent Fuller's
18 testimony about Miguel "violently shaking" his daughter.  Admission of the transcript
19 and recording will be decided at trial, if necessary.

21       IT IS THEREFORE ORDERED that the Government's Motion in Limine
22 Regarding Irrelevant, Unrelated and Remote Investigations from 2003 and 2004 (Doc.
23 83) is granted except as stated above in this Order.

24       Dated: March 25th, 2015.

                                                  Neil V. Wake
                                        United States District Judge