**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-13-08093-001-PCT-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Calvert Les Woody, | |
| Defendant. | |

Before the court is Defendant Calvert Les Woody's Motion to Suppress Statements.  (Doc. 98.)  Woody seeks to exclude incriminating statements made before and after an FBI polygraph examination concerning sexual abuse of two juvenile victims. Expert testimony suggests that, as a result of low average intelligence and cultural differences, Woody may lack the psychological fortitude necessary to withstand potentially coercive interrogation techniques.   In this context, determining whether Woody confessed voluntarily requires more than simply a summary of the words he uttered; other contextual factors, such as tone of voice, the precise questions asked, and the techniques used to elicit an admission, are also critical.  And yet, the only evidence the Government offers to prove voluntariness is the largely conclusory testimony of the FBI officer who interrogated Woody.  While such testimony might usually suffice, it does not carry the Government's burden of persuasion in this case, where there is other credible evidence indicating Woody's will may have been overborne.

The Government could have avoided placing the court in this position had it recorded Woody's confession.  But although it permits recording of all other suspect interviews in Indian country, FBI policy forbids recording polygraph examinations.  As a result, the court lacks neutral evidence of what transpired during Woody's interview, the FBI's interrogation techniques, Woody's comprehension and emotional state, and the words he spoke and that were spoken to him.  The Government's conscious choice not to preserve crucial evidence has thwarted the court's analysis of whether Woody's statements were voluntary.  This choice does not lighten the Government's burden of persuasion.  The evidence the Government does present must be evaluated in light of the evidence it chooses to make unavailable.  Considering both, as well as Woody's expert psychological testimony, the court is not persuaded by a preponderance of the evidence that Woody's statements were voluntary.  The Motion will be granted.

I.      **BACKGROUND**

      **A.      Initial Investigation**

In December 2011, the Navajo Nation Police informed the Federal Bureau of Investigation of child sexual abuse allegations against Woody.  The FBI referred the six-year-old victim, Adriana, to the Flagstaff Medical Center for a forensic interview.  One month later, on January 20, 2012, the FBI arranged another forensic interview for ten-year-old Sylvia, who had also accused Woody of sexual abuse.  Based on those interviews, the FBI undertook to locate Woody.  Agents eventually obtained a telephone number for Woody's girlfriend, Valerie Dale, and through her scheduled a meeting with Woody in the parking lot of a Window Rock, Arizona, Shop 'n Save.

Present at that meeting on June 26, 2012, were Woody, Dale, and their three-month-old son, as well as Special Agents Cheryn Priestino and Matthew Shelley of the FBI.  Woody voluntarily came to the Shop 'n Save.  This meeting lasted about forty minutes, during which Woody stood outside of his vehicle, in control of the keys to his

car.  He made no incriminating statements.  Special Agent Priestino explained that she had reached out to Woody to inform him of the investigation and seek his cooperation.

Later in the conversation, Special Agent Priestino inquired whether Woody would submit to a polygraph examination.  When Woody asked what a polygraph exam was, Dale told him it was equivalent to a lie-detector test.  Special Agent Priestino explained that the test usually takes two to three hours, that it involves attaching electrodes and other equipment to the subject's body, and that the determination of truthfulness hinges on the answers to a handful of questions.  Woody said he would think about Special Agent Priestino's request, and Dale indicated she would contact the FBI if Woody wished to sit for an exam.

**B.    Polygraph Examination and Statements**

Several weeks later Special Agent Priestino called Dale to follow up.  Woody agreed to appear at the FBI's Gallup, New Mexico, field office for a polygraph exam on December 20, 2012.   After Dale dropped Woody off that morning, Special Agent Priestino met him in the lobby of the Gallup office and escorted him to a windowless but well-lit conference room.  Waiting for Woody in the conference room was Special Agent Brian Fuller, a supervisory regional polygraph manager for the FBI.  Special Agent Fuller reviews for accuracy any polygraph exam administered by any FBI agent in the western United States.  He also administers polygraph exams himself.  Over the course of his eighteen-year FBI career, he estimated that he has conducted approximately 1,100 polygraph tests; of that number, roughly 300 involved investigations into crimes in Indian country.  About half of the people he examines, both Native American and non-Native American, give a confession.

Except where specifically noted, what follows is Special Agent Fuller's account of what transpired, taken solely from his notes, his later report, and his testimony at a March 5, 2015 evidentiary hearing.  Special Agent Fuller gave Woody an overview of the polygraph process, during which Special Agent Priestino was present.  Throughout, both agents were dressed in plainclothes and had their weapons and badges concealed.  Special

Agent Fuller asked Woody whether he was willing to take the exam, whether he could read and write, whether he spoke any languages other than English, and how far he had gone in school.  After recording Woody's answers, Special Agent Fuller, sitting at the conference room table, opened an electronic "Advice of Rights" form on his laptop and turned the computer to face Woody, who was seated in a chair against the wall, next to the conference room door.  Under a heading that reads "Your Rights," the form contains a list of the following six statements: 1) "You have the right to remain silent," 2) "Anything you say can be used against you in court," 3) "You have the right to talk to a lawyer for advice before we ask you any questions," 4) "You have the right to have a lawyer with you during questioning," 5) "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish," 6) "If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time."  (Ex. 4.)

Special Agent Fuller read each of these statements aloud to Woody.  He also read out the following disclaimer, located in the "Consent" portion of the form: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."  (*Id.*)  Woody then signed the form without asking any questions or expressing any confusion about his rights.  (*See id.*)

Special Agent Fuller repeated the process with a second form, entitled "Consent to Interview with Polygraph."  (Ex. 5.)  Among the statements on this form that Special Agent Fuller read to Woody were the following: 1) "You have the right to refuse to take the polygraph test," 2) "If you agree to take the polygraph test, you have the right to stop the test at anytime," and 3) "If you agree to take the polygraph test, you have the right to refuse to answer any individual question."  (*Id.*)  The form contains a "Waiver and Consent" section, which reads, in part, "I have read this statement of my rights and I understand what my rights are. I voluntarily agree to be examined by means of the polygraph during this interview. I understand and know what I am doing. No threats or promises have been used against me to obtain my consent to the use of the polygraph."

(*Id.*)  Special Agent Fuller testified that Woody did not convey any misapprehension or ask any questions about this form before signing it.  The copy of this form admitted into evidence shows the signatures of Woody and both agents.  (*See id.*)

At this point, Special Agent Priestino left the room and closed the door behind her, leaving Woody alone with Special Agent Fuller, who began what he termed a "pre-test interview."  In that interview, Special Agent Fuller gathered biographical information about Woody such as his date of birth, height and weight, education and employment history, and criminal record, which he recorded in a "Polygraph Examination Worksheet."  (Ex. 14.)  He explained that the polygraph test would include questions about whether Woody had had inappropriate sexual contact with the victims, as well as other questions.  Through a series of questions about intoxication and sleep the previous night, Special Agent Fuller determined that Woody was eligible to take a polygraph exam that day.

The conversation then moved to the allegations against Woody.  According to a "Polygraph Examination Report" authored by Special Agent Fuller on January 8, 2013, during this portion of the December 20, 2012 pre-test interview Woody made a number of statements that he apparently thought were exculpatory but that are more likely inculpatory.  Woody told Special Agent Fuller he had been at Adriana's mother's trailer in Tsaile, Arizona, for a family get-together.  (Ex. 13 at 1-2.)  While "play fighting"[1] with Adriana on the floor, Woody grabbed Adriana under her armpits and "playful[ly]" touched her breasts.  (*Id.* at 2.)  He also allegedly "touched Adriana's vaginal area over her clothes with his hand," but denied touching her vagina underneath her clothes.  (*Id.* at 2-3.)  Woody placed Adriana on his lap but moved her back to the floor after she began "moving around on his penis."  (*Id.* at 2.)  Because the zipper on the shorts Woody wore that day was not working, his penis fell out of his shorts while he was wresting with

---

[1] All quotations in this discussion are taken from Special Agent Fuller's report, which does not itself use quotation marks.  It is therefore not clear, in any particular instance, whether the words Special Agent Fuller used came directly from Woody or rather were merely a paraphrase of Woody's statements.

Adriana.  (*Id.* at 3.)  Woody "could not remember if Adriana touched his penis or if she tried to put it in her mouth when they were wrestling." (*Id.*)  Later in the interview, however, Woody claimed Adriana had touched his penis but that he had not placed it in her mouth.  (*Id.*)  Woody described all these events as an accident and a "misunderstanding." (*Id.*)

Woody recounted a similar series of events with respect to Sylvia.  During "playful wrestling around" with Sylvia, Woody "touched her vaginal area" over her clothes, but Sylvia never saw or touched his penis.  (*Id.*)  On a separate occasion, in the course of throwing Sylvia on a trampoline, Woody touched Sylvia's vagina and breasts. (*Id.*)  Woody changed his story later in the interview, telling Special Agent Fuller that Sylvia touched Woody's penis when it accidentally fell out of his shorts.  (*Id.*)

After Woody made these statements, Special Agent Fuller invited Woody to move to the polygraph exam chair, which was at the conference room table.  He discussed with Woody the difference between telling the truth and telling a lie and analogized the polygraph to an X-ray machine that monitors the test-taker's physical reactions for signs of dishonesty.  Special Agent Fuller explained to Woody how the polygraph exam works, including how the various pieces of equipment measure a subject's physiological response to questioning.  To show Woody how the polygraph would operate, Special Agent Fuller administered a practice test for which he asked Woody to give knowingly false answers.  Special Agent Fuller then administered the test itself.  Out of eight total questions, Special Agent Fuller asked two "relevant questions": "Did you put your finger in Adriana's vagina?" and "Did you put your finger in Adriana's vagina that day?" (*Id.*) Woody answered "no" to both.  (*Id.*)  Special Agent Fuller then removed the polygraph equipment from Woody and informed him he had not "passed" the test.

When asked what was bothering him, Woody told Special Agent Fuller that during his "play wrestling" with Adriana, he had accidentally slipped the tip of his middle finger into her vagina.  Special Agent Fuller asked Woody whether he would be willing to draw a diagram indicating how far his finger had gone into Adriana's vagina.  Woody agreed

and traced his hand on a sheet of paper, drawing a line across the tip of his middle finger. Above the diagram, Woody signed his name to the following statement: "This is how far I think my middle finger went in her vagina on accident."  (Ex. 6.)

Special Agent Fuller left to retrieve Special Agent Priestino.  Both agents testified that Special Agent Fuller walked Woody through a summary of the statements he had made during the pre- and post-test interviews, stopping periodically to confirm that Woody acknowledged making those statements.  Woody did not object to any of Special Agent Fuller's characterizations.  In Special Agent Priestino's presence, Woody admitted to drawing the diagram that depicted how far his finger had penetrated Adriana "on accident."

Following this debriefing, Woody requested a ride to a McDonald's on the east side of town, where his car was stuck.  Special Agent Fuller, along with Special Agent Priestino and one other agent, drove Woody across town and jump-started his car before returning to the FBI office.

## C.    Dr. McIntyre's Report and Opinions

On April 30, 2013, a grand jury indicted Woody on one count of abusive sexual contact, pursuant to 18 U.S.C. § 2244(a)(5), and two counts of aggravated sexual abuse of a child, pursuant to 18 U.S.C.§ 2241(c).  (Doc. 1.)  A superseding indictment, handed up on June 25, 2013, added a second count of abusive sexual contact.   (Doc. 19.)  Conviction for either of the § 2241(c) counts carries a mandatory minimum sentence of thirty years in prison.  18 U.S.C. § 2241(c).

The court ordered an examination of Woody to determine whether he was "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  (Doc. 90.)  In August 2014, Woody met with Dr. David J. McIntyre, a licensed psychologist with a master's degree and Ph.D. in psychology.  Dr. McIntyre, formerly the chief psychologist

for the Pennsylvania Department of Corrections, currently serves as regional chief of the behavioral health branch for the Indian Health Service in Phoenix.

During his interview with Dr. McIntyre, Woody recounted growing up on the Navajo Indian Reservation as the youngest of seven children raised by a single mother. (Ex. 19 at 1.)  He is an enrolled member of the Navajo Nation who practiced traditional Navajo ways.  (*Id.*)  Woody left the reservation to attend boarding school from first through fifth grades.  (*Id.* at 2.)  After returning to the reservation, Woody attended public schools through the tenth grade, when he dropped out.  (*Id.*)  Woody "hung out with the wrong group of kids" and frequently got into trouble, including more than ten arrests for public intoxication.  (*Id.*)  Between the ages 15 and 21, he reported drinking an average of six cans of beer every night, plus a pint of whiskey on weekends.  (*Id.*)  This heavy consumption resulted in at least ten alcohol-related blackouts.  (*Id.*)  During this period, Woody smoked marijuana "almost daily."  (*Id.*)  When he was 18, Woody got into a drunken fight and was hit in the back of the head with a metal bar.  (*Id.*)  Three years later, during another fight, an assailant struck him on the top of his head with a nightstick. (*Id.*)  He pursued his G.E.D. while living in New Mexico from 2006 to 2010, but never completed the coursework.  (*Id.*)

Dr. McIntyre administered a series of psychological tests to determine whether Woody suffered from a cognitive impairment.  On the Bender Gestalt Test, Woody "received a score of 2 errors," which indicates "no presence of organic brain dysfunction and/or cognitive impairment."  (*Id.*)  Woody scored a 52 on the Brief Cognitive Status Exam, an "instrument designed to assess general cognitive functioning in individuals aged 16 through 90."  (*Id.* at 3.)  This score was consistent with a lack of cognitive impairment.  (*Id.*)  Using the MacCAT-CA test, Dr. McIntyre determined that Woody had minimal to no impairment in his understanding ability, mild impairment in his reasoning ability, and mild impairment in his appreciation ability.  (*Id.*)  Woody's overall score of 38 on the Shipley Institute of Living Scale "place[d] him in the classification of low-average intellectual functioning."  (*Id.*)

1     Dr. McIntyre also conducted the Wechsler Adult Intelligence Scale-IV exam,

2     which "provides standard scores on measures of verbal comprehension, perceptual

3     reasoning, working memory, processing speed, and a full scale IQ score." (*Id.*)  Woody's

4     full scale IQ score of 82 fell in the low average range of intelligence.  (*Id.*)  From the

5     results of these tests, Dr. McIntyre concluded that Woody had "sufficient understanding

6     of the workings of the court and [was] able to work with his attorney in helping prepare

7     his defense." (*Id.* at 4.)  The court adopted this report and ruled on September 23, 2014,

8     that Woody is competent to stand trial.  (Doc. 90.)

9     At defense counsel's request, Dr. McIntyre met with Woody again in December

10    2014.  (Ex. 20 at 1.)  The purpose of these follow-up meetings was to assess the

11    voluntariness of the statements Woody made during his December 20, 2012 meeting with

12    Special Agent Fuller.  Woody told Dr. McIntyre he had waived his right to have an

13    attorney present at the FBI field office "because he didn't know he was going to be

14    interrogated."[2]  (*Id.*)  He described the meeting as "very difficult, upsetting, and scary."

15    (*Id.*)  According to Woody, he initially denied doing anything wrong, but Special Agent

16    Fuller "became increasingly angry and rais[ed] his voice." (*Id.*)  Special Agent Fuller

17    allegedly "would say things like 'I know you did it, I know you did it.'"  (*Id.* at 1-2.)

18    Feeling "overwhelmed and scared," Woody also raised his voice and "became more upset

19    and started agreeing with" Special Agent Fuller.  (*Id.* at 2.)  Woody told Dr. McIntyre, "'I

20    gave in, I gave him what he wanted to hear, I just got angry and whatever he asked I gave

21    him what he wanted to hear, I said what he wanted me to say.'"  (*Id.*)  Woody also

22    reported, "'I started to agree because I felt pressured and uncomfortable, I just wanted

23    this to end.'"  (*Id.*)  Special Agent Fuller allegedly "changed during the interview . . .

24    from quiet to loud, from nice to mean, and he stared at" Woody.[3]  (*Id.*)  In Dr. McIntyre's

25    experience, staring can be interpreted by Native Americans as intrusive and disrespectful.

26

27    [2] Like Special Agent Fuller's Polygraph Examination Report, Dr. McIntyre's report on his psychological evaluation of Woody largely omits quotation marks.  With a few exceptions, it is therefore difficult to know which words, if any, are Woody's own.

28    [3] The Government objected to Woody's hearsay statements as recounted by Dr.

Based on his conversations with Woody, as well as his previous competency examination from August 2014, Dr. McIntyre concluded, "to a reasonable degree of psychological certainty, [that] the interrogation techniques employed by [Special Agent Fuller] may have affected the voluntariness of Mr. Woody's admission." (*Id.*)   Dr. McIntyre wrote and testified that this conclusion rested on consideration of four factors.

The first factor was the phenomenon of historical trauma.  According to this theory, which was first propounded in the 1980s by Dr. Maria Yellow Horse Brave Heart, a Native American professor of clinical social work, the traumatic effect of certain events in Native American history is internalized and passed on to later generations through epigenetic transfer, among other means.  The cumulative psychological wounding resulting from colonization, relocation, and other historical traumas can create a sense of hopelessness or lack of control that permeates Native American culture.  As Dr. McIntyre put it in his report, "The theory of historical or intergenerational trauma suggests that some Native Americans experience depression, substance dependence, dysfunctional parenting, and unemployment as a result of unresolved trauma from historical losses (loss of people, land, and culture) that occurred to their forefathers (great grandparents, grandparents, and parents) and transmitted to the younger generation." (*Id.*)   Dr. McIntyre stressed that historical trauma does not affect all Native Americans' resilience and ability to resist equally, and the theory does not purport to show that Native Americans can never be subjected to interrogation.  Nevertheless, historical trauma often induces a feeling of powerlessness that could render a Native American willing to provide desired information simply in order to terminate an uncomfortable interrogation. Dr. McIntyre has personally observed historical trauma in some of the patients he treats through his work at the Indian Health Service.

The second factor in Dr. McIntyre's analysis was "different values and behavioral patterns among Native Americans as compared to mainstream culture." (*Id.*)   Among these values is "a more fatalistic view of life" and Native Americans' "inclin[ation] to

McIntyre.  That objection is discussed *infra* Part III.B.

give up control and take on a belief of 'what is meant to happen will happen and you can't change it.'" (*Id.*)  Dr. McIntyre opined that Native Americans "consider directness and assertiveness as offensive behaviors." (*Id.*)  In addition, "Native Americans are inclined to consider others (family, community) before making a decision," with the result that "decisions can [be] shaped by others, especially if making a decision will avoid or reduce conflict in the present moment." (*Id.*)  Dr. McIntyre testified that many Native Americans avoid conflict at all costs, and when conflict becomes too great, they may submit or walk away rather than push back.  The result is that Native Americans may be more susceptible to interrogation pressures, although Dr. McIntyre conceded he could point to no published research supporting this conclusion.  In his many years working with Native American people, Dr. McIntyre has witnessed clients and others admit to things they did not do simply to escape conflict.  He observed some typical Native American characteristics in his interactions with Woody.

Dr. McIntyre next looked at cognitive impairment.  As explained above, Dr. McIntyre concluded during his August 2014 competency exam that Woody did not suffer from any cognitive impairment.

Finally, Dr. McIntyre considered Woody's low average intelligence.  About 64% of the population falls within one standard deviation of the mean IQ score of 100—that is, in the 85-115 range.  Roughly 2% fall below 70, the cutoff for mental retardation.  At 82, Woody's full scale IQ is closer to the range for borderline mental retardation, 70-79, than it is to the mean.  In Dr. McIntyre's opinion, Woody's low average intelligence makes it difficult for him to resist the kinds of stresses and pressures a subject might experience during a police interrogation.  Historical trauma and cultural differences amplify his susceptibility to coercive interrogation techniques.  Dr. McIntyre's report summarized his evaluation this way: "Matters of low average intelligence, cognitive impairment, historical trauma, and the Native American cultural differences apply to Mr. Woody and may have contributed to Mr. Woody's will being overborne." (*Id.*)

1      Woody asks that any inculpatory statements he made during his December 20,

2  2012 interview be suppressed on the grounds that they were obtained in violation of

3  *Miranda v. Arizona*, 384 U.S. 436 (1966), and were obtained involuntarily.

4

## II.     WOODY WAS NOT IN CUSTODY

6      A "person questioned by law enforcement officers after being 'taken into custody

7  or otherwise deprived of his freedom of action in any significant way' must first 'be

8  warned that he has a right to remain silent, that any statement he does make may be used

9  as evidence against him, and that he has a right to the presence of an attorney, either

10  retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting

11  *Miranda*, 384 U.S. at 444). "But [a]n officer's obligation to give a suspect *Miranda*

12  warnings before interrogation extends only to those instances where the individual is 'in

13  custody.'" *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (alteration in

14  original) (citation and some internal quotation marks omitted). "To determine whether an

15  individual was in custody, a court must, after examining all of the circumstances

16  surrounding the interrogation, decide whether there [was] a formal arrest or restraint on

17  freedom of movement of the degree associated with a formal arrest." *Id.* (brackets in

18  original). The court asks whether, based on objective factors, a "reasonable innocent

19  person in such circumstances would conclude that after brief questioning he or she would

20  not be free to leave." *Id.*

21      The Government contends Woody was not entitled to *Miranda* warnings before

22  questioning because he was not in custody. The Government also argues that Special

23  Agent Fuller obtained a valid written waiver of Woody's *Miranda* rights. Woody arrived

24  at the FBI office in Gallup of his own accord. The FBI did not bring him there against

25  his will. A "reasonable innocent person in such circumstances" may well have believed,

26  judging from objective factors, that he would be free to leave after brief questioning. *Id.*

27  The court therefore concludes that Woody was not in custody when the interrogation

28  began.

III.  **THE GOVERNMENT HAS NOT CARRIED ITS BURDEN OF PERSUASION THAT WOODY'S STATEMENTS WERE VOLUNTARY**

A.    **Involuntariness and the Risk of False Confessions**

"Statements obtained in violation of *Miranda* generally are inadmissible in the government's case-in-chief."  *United States v. Gomez*, 725 F.3d 1121, 1125-26 (9th Cir. 2013).  But compliance with *Miranda* does not necessarily ensure the admissibility of inculpatory statements.  "A confession must be suppressed, even absent a *Miranda* violation, when the totality of the circumstances demonstrates that the confession was involuntary."  *Deweaver v. Runnels*, 556 F.3d 995, 1002-03 (9th Cir. 2009).

The dangers of involuntary confessions are well-documented.  In announcing a new set of prophylactic rights in *Miranda*, the Supreme Court was concerned about "an interrogation environment [that] is created for no purpose other than to subjugate the individual to the will of his examiner."  384 U.S. at 457.  Key to creating such an environment were the tactics used by police officers when questioning suspects.  *See id.* at 448-49.  Drawing on passages from a popular police manual, the Supreme Court described some of those tactics as follows:

> "To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe.  Patience and persistence, at times relentless questioning, are employed . . . . When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems . . . . It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings.  The police then persuade, trick, or cajole him out of exercising his constitutional rights."

*Id.* at 455 (citing Inbau & Reid, *Criminal Interrogation and Confessions* (1962)).  At times, the Supreme Court noted, these "[i]nterrogation procedures may even give rise to a false confession."  *Id.* at n.24.

To protect against this possibility, courts ask "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."  *Doody v. Ryan*,

649 F.3d 986, 1008 (9th Cir. 2011) (en banc).  This voluntariness test, which is rooted in due process, "takes into consideration the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation. . . . [A]ll the circumstances attendant upon the confession must be taken into account." *Id.* (citations omitted).  "As the Supreme Court has observed, '[t]he application of these principles involves *close scrutiny* of the facts of individual cases.'"  *Id.* (alteration and emphasis in original) (citation omitted).

A variety of "factors, in company with all of the surrounding circumstances — the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control — is relevant. Thus, the voluntariness inquiry is not limited to instances in which the claim is that the police conduct was 'inherently coercive,' but applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will."  *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (citations and most internal quotation marks omitted).  The court must weigh "the circumstances of pressure against the power of resistance of the person confessing."  *Id.*  That is, "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne."  *Id.* at 1020 (emphasis in original).  There is no "talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen," and "no single controlling criterion . . . [is] dispositive."  *Id.* at 1017 (internal quotation marks omitted).

*Miranda* was concerned with custodial interrogation, *see* 384 U.S. at 458, but coercive interrogation techniques of the kind described in *Miranda* can override a suspect's will even in less restrictive environments.  In *Preston*, where the defendant was

questioned outside his house, next to an unmarked FBI vehicle, the Ninth Circuit echoed the Supreme Court's observation in *Miranda* that "most police officers have been trained in psychological techniques designed to induce confessions from reluctant suspects." 751 F.3d at 1022-23, 1030. The Ninth Circuit discussed the same "Reid manual" on which the Supreme Court had relied in *Miranda*. *Id.* at 1023 (citing Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, *Criminal Interrogation and Confessions* (5th ed. 2013)). Among the tactics included in that manual, and employed on the *Preston* defendant, were asking a defendant "a number of questions that presented him with two alternatives as to how the crime was committed," applying "repeated pressure to change answers inconsistent with guilt and adopt answers evidencing guilt instead," and "embed[ing]" a "desired response . . . in the question." *Id.* at 1023-24. The Reid technique, named after the former detective who pioneered it, also counsels interrogators to engage in "minimization," i.e., "steer[ing] the subject toward a confession by offering a face-saving alternative." Douglas Starr, *The Interview: Do Police Interrogation Techniques Produce False Confessions?*, The New Yorker, Dec. 9, 2013, at 43.

"Outside of the custodial setting," the Ninth Circuit wrote in *Preston*, "these techniques have never been held inherently coercive in the sense that the resulting confessions are necessarily involuntary." 751 F.3d at 1023. But "there is no single litmus-paper test for constitutionally impermissible interrogation, and no individual feature of the interrogation is determinative of whether a confession is voluntary." *Id.* (internal quotation marks omitted). The Ninth Circuit explained:

> [A]s interrogators have turned to more subtle forms of psychological persuasion, and away from physical coercion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. It simply "takes less" in terms of sophisticated police interrogation techniques to interfere with the deliberative processes of one whose capacity for rational choice is limited than it takes to affect the deliberative processes of one whose capacity is not so limited.

1    *Id.* at 1023 (alteration in original) (citations and most internal quotation marks omitted).

2    Where the "psychological evidence" suggests a defendant is "likely to acquiesce in

3    suggestions made by the questioner … recognizing that where one is asked 'a or b,' one

4    can answer 'neither one,' rather than acquiescing in one or the other, could well  . . .

5    exceed[] his intellectual abilities." *Id.* at 1024.  Accordingly, "the voluntariness standard

6    applies to suspects not in custody." *Id.* at 1015 n.11.

7         The "government must prove voluntariness by a preponderance of the evidence."

8    *United States v. Williams*, 435 F.3d 1148, 1153 n.5 (9th Cir. 2006).

9         **B.    Application in This Case**

10        Special Agent Fuller testified that he never raised his voice when interviewing

11   Woody, he never made comments to Woody along the lines of "I know you did this," he

12   never threatened Woody or made promises of leniency in return for cooperation, Woody

13   seemed to understand all questions that were asked of him during the pre-test interview,

14   and Woody reported being treated professionally at the end of the interview.  But Special

15   Agent Fuller has received training in the Reid technique and sometimes uses aspects of it

16   during interrogations.  Although he denied ever intentionally deceiving an interview

17   subject, he acknowledged that he generally employs minimization, for instance by

18   suggesting a suspect may have violated the law accidentally or had an out-of-character

19   experience.  He could not remember the precise words he used when attempting to

20   "minimize" Woody's contact with Adriana and Sylvia, or at what point in the pre-test

21   interview he employed the tactic, but he admitted using minimization in his meeting with

22   Woody.  He claimed, however, that Woody was the first person to introduce the word

23   "accident" into their conversation.

24        The court is persuaded by and accepts Dr. McIntyre's expert testimony, though the

25   court puts minor weight on his reliance on Native American historical trauma.  That

26   theory may well be sound, but regardless, his opinions are well supported by the other

27   factors on which he relies.  The effects of historical trauma appear to coincide to a large

28   degree with those of cultural differences.

In accepting Dr. McIntyre's opinions, the court places limited weight on Woody's hearsay statements to Dr. McIntyre about what happened during the interrogation. Those statements are admissible under Federal Rule of Evidence 703, which provides that "if the facts or data [underlying an expert's opinion] would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Here, the prejudice to the Government from considering the statements is substantially outweighed by their relevance to the soundness of Dr. McIntyre's opinion that the circumstances of the interview "may have affected the voluntariness of Mr. Woody's admission." (Ex. 20 at 2.) It is also outweighed by the Government's own ability to have avoided prejudice by preserving direct evidence of the interrogation. Although the court does not independently consider them for their truth, Woody's statements show the gravity of the evidentiary vacuum the Government created and therefore bear on the weight to be given to the incomplete evidence the Government does present.

It is against this backdrop—an interrogator trained in "techniques designed to induce confessions from reluctant suspects," *Preston*, 751 F.3d at 1023, who offers the only account of his interview with a psychologically vulnerable subject—that the court must determine the voluntariness of Woody's statements. The inquiry demands close attention to the particular facts of this case. The court does not decide whether Special Agent Fuller's tactics were inherently coercive, but rather whether this particular defendant, who for individual and cultural reasons may be unusually willing to confess falsely to accommodate an interrogator, was coerced into admitting guilt. This is a context in which seemingly subtle details can bear significantly on the outcome. The tone of Special Agent Fuller's voice, the force with which he resisted Woody's denials, the extent to which he "embedded" details of the alleged abuses in his questions, the exact language by which he minimized Woody's alleged conduct, the degree to which he repeated leading questions until he heard the answer he sought—all these factors and others might be less probative in the typical case, but they take on outsized importance

here.  Raised in a traditional Navajo family, Woody well could have taken Special Agent Fuller's demeanor as "very difficult, upsetting, and scary" and perceived him as "increasingly angry," even though Special Agent Fuller did not think he presented that way.

Woody's conduct during the interview is also relevant to voluntariness.  Did he speak in full sentences, or only in monosyllables?  Did he state clearly that he had touched Adriana and Sylvia inappropriately, or did Special Agent Fuller merely infer as much from a series of confused, contradictory, perhaps incoherent statements?  Did he volunteer details and explanation, or were they embedded in questions as part of the "minimization" that Special Agent Fuller used?  Did Woody answer questions without pause, signaling comprehension, or did he answer only haltingly, suggesting confusion?  The answers to such questions are crucial to deciding whether Woody's will was overborne.

Unfortunately, the court lacks this crucial evidence.  Despite the presence of audio recording equipment at the Gallup FBI field office, Special Agent Fuller did not record the interview.  Special Agent Priestino testified that at the time of that interview, in December 2012, FBI agents investigating crimes in Indian country had "blanket permission" to record suspect interviews, as long as they filed the appropriate paperwork.  Thus, she recorded her June 26, 2012 conversation with Woody at the Window Rock Shop 'n Save.  For crimes committed elsewhere, agents had to request permission from the special agent in charge, who would either grant or deny a request on a case-by-case basis.  Special Agent Priestino has never received an explanation for this policy and could not speculate as to its rationale.

But according to Special Agent Fuller, FBI policy at the time prohibited the recording of any polygraph examination, even when administered as part of an investigation into Indian country crimes.  This prohibition covered not just the polygraph exam itself, but also the pre- and post-test interviews.  In other words, from the time Special Agent Priestino left the conference room until the time the two agents finished

confirming with Woody the statements he had made, FBI policy forbade recording. Special Agent Fuller testified that in limited circumstances, agents could request approval to record all aspects of the polygraph exam—that is, the pre-test interview, the test itself, and the post-test interview—but that permission is rarely granted. Special Agent Fuller did not seek permission to record his interview of Woody. He listed child abduction investigations as one area in which permission might sometimes be granted, but he could not articulate any criteria that special agents in charge used when deciding whether a polygrapher could record. Nor could Special Agent Fuller explain why the FBI prohibits recording polygraph exams; he just follows a policy set by his superiors. Counsel for the Government was similarly unable to offer any justification for the FBI's refusal to record polygraph exams, including in Indian country crimes.

Beginning around October 2014, Special Agent Fuller testified, the FBI implemented a new policy under which agents may record a subject's reading and signing of the Advice of Rights and Consent to Interview with Polygraph forms, as well as the post-test interview. But the pre-test interview and the polygraph exam itself still may not to be recorded. Remarkably, the FBI will now record the parts of the process most likely to support the Government's version of events, but not the critical part most likely to help the suspect if his statements were involuntary. Special Agent Fuller is in consultation with others at the FBI about loosening the policy further.

Absent a recording of Woody's statements, the court is left to reconstruct the December 2012 interview from Special Agent Fuller's account. *Cf. Preston*, 751 F.3d at 1020 ("We note that there can be no dispute as to what happened during the interrogation itself. We have the audiotapes and transcript of the interrogation, and so are not consigned to an evaluation of a cold record, or limited to reliance on the detectives' testimony." (internal quotation marks omitted)). That account consists mainly of conclusions: that Special Agent Fuller does not use deception, that he did not make threats, that he did not raise his voice, that Woody's statements were voluntary. Taking Special Agent Fuller at his word that he views his techniques as non-coercive, the court

still lacks an objective basis to determine that the interrogation was not perceived as coercive by Woody, whose cultural differences, low intelligence, and personal background may have collectively produced a different experience.  The court must take account of such "characteristics of the accused," *Doody*, 649 F.3d at 1008, but cannot do so if the Government fails to provide the evidence of actual words, actions, and context necessary to determine Woody's perception and experience.  Special Agent Fuller's assessment and memory alone fail to persuade this trier of fact, given the crucial evidence the Government intentionally left behind that would make this task easier.

As another federal district court facing similar facts has explained:

> The Court is severely handicapped in its assessment of the voluntariness of Defendant's statements by the United States' failure to electronically record the interrogation leading to [his] statements. The FBI agents who conducted the interrogation clearly knew and intended that any inculpatory statements given by Defendant would be the centerpiece of the United States' case if charges were brought against Defendant. Yet, consistent with FBI standard operating procedures, the interrogation was not recorded, resulting in the loss of irreplaceable information, such as the actual words spoken by the participants, their body language, facial expressions and tone of voice, and other nuances that cannot be conveyed by an after-the-fact, written report.

*United States v. Bundy*, 966 F. Supp. 2d 1180, 1185 (D.N.M. 2013).

It is a secret why the Government purposely hamstrings courts in this way when recording equipment is available and only needs to be turned on.  The FBI policy not to preserve this crucial evidence has no stated justification.  It is a policy without a purpose—or none that is admitted.  In this case, as in many in Indian country, the Government's chief witness is a college-educated, professionally trained interviewer from the dominant culture who—out of sight of others—interrogated a lower-functioning traditional Navajo with marginal education, lesser understanding of what was happening, and without the articulateness so valued in the dominant culture.  In assessing whether this imbalance produced an involuntary confession, the court is deprived of the nuanced details and is left with the conclusions and memory of Special Agent Fuller.  Finding this

testimony inadequate does not require imputing bad faith to Special Agent Fuller.  As the *Bundy* court noted, relying on the work of one of the FBI's own agents, "there are recognized problems with such testimony, including 'problems associated with recollection,' 'disparities in perception or preconceived biases,' and statements that have 'equivocal interpretations.'  'People, including officers and suspects, forget facts or reconstruct and interpret them differently.'"  *Id.* at 1186 n.3 (quoting B. Boetig, et al., *Revealing Incommunicado: Electronic Recording of Police Interrogations*, Vol. 75, No. 12, FBI Law Enforcement Bulletin 1 (Dec. 2006)).  Of particular importance in this case, "Problems with 'disparities in perception' are heightened where, as here the interrogators and the suspect are from different cultures." *Id.*  Electronic recording of the interrogation would have taken any unfair advantage away from the FBI and left neutral, accurate evidence in its place.  In the Government's words: "[T]he presence of a recording would likely have made it easier for the Court to resolve the issues presented."  (Doc. 103 at 11.)

There is some indication that the policy is an attempt to prevent juries and judges from discovering how agents extract confessions and from making accurate determinations of voluntariness.  A 2006 memorandum from the FBI's Office of the General Counsel admonishes field agents: "[A]s all experienced investigators and prosecutors know, perfectly lawful and acceptable interviewing techniques do not always come across in recorded fashion to lay persons as proper means of obtaining information from defendants. Initial resistance may be interpreted as involuntariness and misleading a defendant as to the quality of the evidence against him may appear to be unfair deceit." *Bundy*, 966 F. Supp. 2d at 1186 n.2 (alteration in original) (citation omitted).  The court does not say whether this is the FBI's true motivation, but then the Government cannot come up with a better motivation—or any motivation.  Whatever the reason, the FBI has made a deliberate choice in this case to deprive the court of superior evidence for assessing voluntariness, hoping the court will rely instead on secondary evidence filtered through the FBI.

"[S]uppression is not warranted simply because the government fails to record an interview." *United States v. Romo-Chavez*, 681 F.3d 955, 961 n.5 (9th Cir. 2012). While "a bad faith failure to collect potentially exculpatory evidence would violate the due process clause," law enforcement generally is under no "duty to *obtain* evidence" that might exculpate a defendant. *Miller v. Vasquez*, 868 F.2d 1116, 1119-20 (9th Cir. 1989) (emphasis in original). But this case is not about failure to obtain evidence for the defendant; it is about presenting incomplete, perhaps subconsciously biased evidence of a single event and leaving behind more clinical evidence of the same event that could aid the defendant, without any justification for doing so.

A knowing decision to leave no objective record of a suspect's interview may be relevant to voluntariness, depending on the specific facts. Under the "totality of the circumstances," "the failure by the FBI to use equipment at its disposal might support a larger inference that the agents' testimony did not accurately portray the circumstances surrounding [a defendant's] confession." *United States v. Wright*, 625 F.3d 583, 604 n.10 (9th Cir. 2010) (quoting, in parenthetical, *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988)). A "district court may support any disbelief it has of any witness' testimony by noting the lack of a recording." *Id.* When recording equipment is available but "the government chooses to memorialize evidence in some other form, the government's case may be subject to attacks of the memorializing agent, arguments regarding negative inferences, or similar consequences." *United States v. Nixon*, No. CR 14-668-TUC-CKJ (LAB), 2015 U.S. Dist. LEXIS 4862, at *4 (D. Ariz. Jan. 15, 2015) (discussing government's failure to record statements given by material witnesses).

The court does not find that Special Agent Fuller offered any knowingly false testimony. The question, rather, is whether his memory is complete and accurate on the critical context, details, and actual perceptions. The unavailability of better evidence can bear on how persuasive the available evidence is. In some interrogations, recording equipment will not be accessible or convenient. The lack of a recording could be less important in routine interviews or in other circumstances when agents are pressed for

time.  But the calculus is quite different when the FBI invites a suspect to its office for the purpose of turning an earlier denial into a confession, as happened in this case.  That the Government made this choice pursuant to an official policy in no way aids the Government.   The Government cannot change the natural persuasive force of abandonment of evidence by engaging in it routinely.

On the facts of this case, in light of Woody's background and characteristics, the conscious choice to deny the court essential evidence weighs against the Government. To assess voluntariness, the court must weigh the "power of resistance of the person confessing" against "the circumstances of pressure" brought to bear on him.  *Preston*, 751 F.3d at 1016.  In an ordinary case against a suspect with average intelligence, cultural parity, personal confidence, and powers of resistance, the FBI's deliberate failure to preserve evidence of an interview intended to change a denial into a confession might be less important to determining voluntariness.  But this is no ordinary case.  A respected psychologist with extensive experience with Native American people persuasively opined that Woody may not have possessed the intellectual and psychological tools with which most people can resist coercive interrogation techniques.  In Dr. McIntyre's professional opinion, Woody is at risk of making coerced statements under high-pressure questioning. He believes that may have happened here.   Dr. McIntyre's determination was individualized; he did not say every Native American lacks the cognitive wherewithal to withstand interrogation.  In this specific case, the objective evidence the FBI willfully failed to preserve could matter.  When it does this, the Government runs the risk that the trier of fact may be less than persuaded by the secondary evidence the Government does put forward, which comes refracted through the subconscious of someone with much different education, acculturation, and expectations for an interview.

The Government's mistake was in slighting its need to persuade the court that Woody confessed voluntarily.  "The Court cannot require the United States to record interrogations.  But if the United States fails to record interrogations, it must bear the consequence in cases such as the present where the actual words employed by the

1    participants, their tone of voice, and their body language are necessary factors in the

2    Court's voluntariness analysis." *Bundy*, 966 F. Supp. 2d at 1186.

3           In light of the harm to the alleged victims, the importance of Woody's

4    constitutional rights, his personal background and characteristics, and the mandatory

5    minimum sentence of thirty years in prison, the FBI took a needless risk in not recording

6    these statements.  The lack of potentially dispositive evidence for which the Government

7    is responsible undermines the weight of the limited evidence the Government does

8    present.  The court is not persuaded by a preponderance of the evidence that Woody's

9    statements were voluntary.

10          IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Statements

11   (Doc. 98) is granted.  Defendant's statements in his December 20, 2012 interrogation and

12   the fruits thereof are excluded from evidence.

13          Dated this 6th day of April, 2015.

14

15

16                                                    _____
                                                     Neil V. Wake
17                                                   United States District Judge

18

19

20

21

22

23

24

25

26

27

28